**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NELI MEDVEDEVU, on behalf of herself, all others similarly situated, and the general public,<br><br>  Plaintiff,<br><br>   v.<br><br>REGIONAL WOMEN'S HEALTH GROUP, LLC,<br><br>  Defendant. | Case No.:<br><br>**COMPLAINT - CLASS ACTION**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff NELI MEDVEDEVU, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, brings this action against Defendant REGIONAL WOMEN'S HEALTH GROUP, LLC, d/b/a Axia Women's Health Management and/or Axia Women's Health ("Axia"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## **INTRODUCTION**

1.  Defendant Axia is a private healthcare system that provides a wide spectrum of in-person and online care focused on women's health. Axia owns and operates the website located at https://www.axiawh.com ("axiawh.com," or the "Website"), which provides a portal to access Axia-provided health services for women.

2.  People visiting axiawh.com regularly search for women's health centers, submit detailed information forms, access medical resources, send messages to care centers, schedule appointments, and pay medical bills.

1

3. Unbeknownst to Plaintiff—and in a significant violation of her privacy—Axia allowed third parties, without consent or notice, to intercept, read, and use for commercial gain her personally identifying information ("PII") and protected health information ("PHI") collected while she browsed and used axiawh.com.

4. Plaintiff, on behalf of herself and others similarly situated, brings this action to enjoin Axia from disclosing Website users' PII and PHI to third parties without consent; to enjoin Axia from embedding third-party tracking technology on axiawh.com that intercepts and transmits such information without users' knowledge; and to recover compensatory damages for herself and other aggrieved Class Members.

## JURISDICTION & VENUE

5. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the Class of plaintiffs is a citizen of a State different from Defendant. In addition, more than two-thirds of the members of the Class reside in a state other than the state in which Defendant is a citizen, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

6. The Court also has original jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States (the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*).

7. The Court has personal jurisdiction over Axia because its principal place of business is in Oaks, Pennsylvania. The Court also has personal jurisdiction over Axia because it has purposely availed itself of the benefits and privileges of conducting business activities within Pennsylvania by offering health services in Pennsylvania, and by making axiawh.com available to

Pennsylvania consumers. Axia is also registered with the Pennsylvania Department of Corporations as a Foreign Limited Liability Company, No. 6962459.

8. Venue is proper in this Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides in (*i.e.*, is subject to personal jurisdiction in) this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

9. Plaintiff Neli Medvedevu is over 18 and resides in Montgomery County, Pennsylvania.

10. Defendant Axia is a New Jersey corporation with its principal place of business in Montgomery County, Pennsylvania.

## FACTS

**I. PATIENTS USING AXIAWH.COM COMMUNICATE PII AND PHI**

11. Axia, which reported about $750 million in annual revenue in 2025, owns and operates axiawh.com.

12. When users browse the Website to search for medical care services, including when clicking on specific care providers and links, or when manually typing search queries into the Website's built-in search function, they communicate private and extremely personal information to Axia. This includes, but is not limited to, medical conditions, care preferences, and appointment schedules, all of which constitute PHI.

13. The Website's home page includes a prominent link along the top bar to "Find Care Near You." Alternatively, users may select a "Find Care" button on the home page. Either link brings them to the Website's "Find Care" page (https://axiawh.com/location-provider-search).



14.     When users click the "Service" dropdown menu, they are presented with more than a dozen discrete medical specialty categories, such as fertility, weight loss, maternal fetal medicine (a branch of obstetrics focusing on high-risk pregnancies and care for mothers and babies facing complex health issues), and breast health. When a user selects a category, the website captures data reflecting the specific type of medical care the user is seeking. Thus, users communicate information about their medical conditions—their PHI—to Axia.

4

15. The Website also features a "Find Care Near You" page, which allows users to browse or search for nearby medical facilities along with specific services. By using the Find Care Near You page, Website users communicate both PII and PHI to Axia.

16. To use the Find Care Near You page, a user inputs their zip code, then is given a selection of services available within a certain geographical range. The Website then generates a list of clinics, providers, and services along with an embedded Google Map display. If these results are insufficient, the patient can click on "View All Locations" and the Website provides all locations that provide the service for which the patient is searching. The Find Care Near You page is depicted below.



17.     When the patient clicks on a particular provider profile, they are sometimes able to make an appointment directly through the Website with that provider. To do so, patients must enter their full name, date of birth, preferred location, patient status, email, phone number, and type of appointment, further revealing PII and PHI, as depicted below.



18.     Website users also have access to a "Patient Forms" page, where they can submit medical documentation and insurance information, in which case they must also provide their full name, date of birth, state, and phone number, as depicted below. Users who fill out a "Patient Form" thus communicate their PII and PHI to Axia.



19.    The Website also features a "Contact" page, where users can input their first and last name, phone number, email address, and reason for the inquiry, thereby disclosing PII and

PHI to Axia. This inquiry is available for existing and prospective patients, and even non-patients, as depicted below.



## II.   AXIA WEBSITE USERS HAVE A REASONABLE EXPECTATION OF PRIVACY IN THEIR PII AND PHI

20.     When Website users communicate their PII and PHI to Axia, they reasonably believe Axia will maintain the confidentiality of that information, due to both the inherently sensitive and private nature of the information, and due to the long-standing and well-known legal protections afforded to such information.

21.     "Since the creation of the Hippocratic Oath around 400 B.C., protecting the privacy of patients has been a key component of the physicians' code of conduct."[1] Today, people continue

---

[1] https://epic.org/issues/data-protection/health-privacy.

to believe their health data is protected through laws such as the Health Insurance Portability and Accountability Act ("HIPAA").

22.    Moreover, while all health data is inherently sensitive and private, the health data communicated to Axia over axiawh.com is particularly so. For example, users can search for "Fertility" services, a matter widely recognized as deeply personal, private and sensitive. Other provided topics, like "Gynecology," "Genetics," "Midwifery," and "Obstetrics," similarly implicate reproductive care.

23.    According to the Electronic Privacy Information Center, "[h]ealth privacy and reproductive privacy implicate some of our most sensitive information that can reveal intimate characteristics about us."[2] "The right to make reproductive choices about one's own body—free from commercial or governmental interference—is inherent to one's dignity and autonomy."[3] Indeed, the expectation of privacy over reproductive health information is particularly high today given recent efforts to criminalize certain reproductive health choices.

24.    Other services on the Website include "Rejuvenation" and "Menopause Solutions," for example, which reveal information considered to be particularly sensitive or stigmatized.

25.    Further, the Website provides no notice to users that their PII and PHI is being tracked, collected, or stored. Nor are Website users given any choice to opt in or out of the collection of their PII and PHI.

26.    At the bottom of the Website's homepage—where users can and do ignore it—are inconspicuous, fine-print links to a "Privacy Policy," and "Notice of Privacy Practices." Even if a

---

[2] *Id.*

[3] *Id.*

user reviewed these documents, nowhere do they disclose Axia allows third parties to collect and use for financial gain Website users' PII and PHI.

## III.   THIRD PARTIES COLLECT AND PROFIT FROM AXIA WEBSITE USERS' PHI AND PII WITHOUT THEIR CONSENT

27.   Because Plaintiff and other Class Members are unaware of third-party tracking on the Website, they could not and did not consent to it.

28.   Notwithstanding Website users' lack of consent, Axia allows third parties to intercept and use for commercial gain their PII and PHI.

29.   During the Class Period and continuing today, axiawh.com has, at various times, used at least five trackers: Google Analytics, Google DoubleClick, The Trade Desk Pixel, Adobe Marketo Engage Munchkin, and HubSpot. Each tracker installed on axiawh.com allows its owner (for example, Google) to eavesdrop on, collect, and use for pecuniary gain the PII and PHI of Axia Website users, including Plaintiff and other Class Members.

30.   Axia deploys these trackers—sometimes called tags—through a program called Google Tag Manager ("GTM"), which allows website owners to deploy, modify, and remove tracking technologies, cookies, and third-party scripts across a website with ease, and without direct modification to the website's underlying code.

31.   By virtue of Axia's use of GTM, additional trackers were deployed, rotated, added, and removed throughout the Class Period without public notice or disclosure. This Complaint encompasses Axia's use of GTM and its deployment of all tracking technologies, cookies, and similar data collection tools employed on axiawh.com during the Class Period capable of collecting or intercepting Website users' PII and PHI.

32.   Plaintiff describes Axia's use, during the Class Period, of five trackers below.

10

### A.      Google Analytics

33.      As users interact with Axia's Website—such as by using the site's "location-provider-search" functionality or entering search queries—third-party Google Analytics trackers embedded on the website operate in real time to collect and transmit information reflecting those interactions to Google. This includes the granular substance of the user's search queries and other inputs entered into the Website.

34.      As users refine their search criteria, review results, and navigate to individual provider profile pages, these embedded trackers contemporaneously monitor and capture those interactions. The trackers then transmit this information to Google, including users' selections of specific providers and their review of particular medical services, which reflect users' private healthcare-related interests and inquiries.

35.      At the same time, Google Analytics captures and transmits users' IP addresses with each interaction. Each network request initiated during a user's session includes the user's IP address as the source of the communication, which is transmitted to Google along with the user's activity. An IP address constitutes a persistent identifier capable of being linked to an individual or household. Its collection and transmission significantly increases the identifiability of users and enables third parties to track, profile, and associate users' online activities across sessions and platforms.

36.      An IP address is a numerical identifier assigned by an Internet Service Provider to a user's device or network connection and is used to route communications across the Internet.

37.      IP addresses function as the addressing system of the Internet and can reveal the geographic location of users. In fact, publicly available tools can map IP addresses to specific geographic areas, including a user's city, region, or Internet Service Provider.

11

38.    Because IP addresses can be used to determine a user's location and link activity across websites, they are highly valuable for digital advertising and tracking. Companies use IP addresses to target advertisements geographically and to build detailed profiles of users' browsing behavior tied to their location.

39.    For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," recognizing that even de-identified or pseudonymized data may constitute personal data where it can be used to re-identify an individual.

40.    Google monetizes the information captured through these trackers by using it for targeted advertising. When a user is logged into a Google account, the trackers include user-specific identifiers within the transmitted data, allowing Google to associate the intercepted information directly with the user's account identity.

41.    Regardless of whether a user is logged into a Google account, the embedded trackers monitor, collect, and transmit users' interactions, tying those interactions to a unique profile through Google's NID cookie and related tracking technologies. The unique identifier associated with the user—together with other data points, including the user's IP address—enables Google to link activity to a particular individual or household. This allows Google to track users' preferences and behavior across its services and other websites. Thus, even in the absence of authentication, Google can, and does, track users' browsing behavior, including when an individual browses axiawh.com, and exploits users' PII and PHI for pecuniary gain through targeted advertising.

42.    Studies have shown that Google links users' visits to sensitive websites, including healthcare portals, with user identities, through such identifiers, demonstrating that the information intercepted and transmitted is personally identifiable.

43.     Google integrates the information it captures through these trackers with its advertising services, including Google Ads, to refine user profiles and enhance targeted advertising. By monitoring user behavior across multiple websites, Google increases the effectiveness of its advertising and, in turn, its advertising revenue.

44.     By embedding Google Analytics on the Website, Axia enables this real-time interception and use of users' PII and PHI, which it then leverages for its own marketing and advertising purposes, including to reach users across other websites and communication channels based on their interactions with axiawh.com.

**B.      Google's DoubleClick**

45.     DoubleClick is an advertising tracking technology that deploys third-party trackers on websites to monitor and collect users' behavioral information. These trackers create and maintain independent profiles of users based on their interactions across websites, without requiring users to be logged into a Google account.

46.     DoubleClick trackers embedded on websites use cookies, including the IDE cookie, to identify users and monitor their interactions with webpages in real time, such as the pages they visit, the links they click, and the services they select.

47.     For users signed in to a Google account, DoubleClick also uses the DSID cookie to associate this activity across multiple websites, enabling persistent tracking across browsing sessions.

48.     When a user interacts with Axia's website, DoubleClick trackers embedded on the Website operate contemporaneously to intercept, collect, and transmit that information to Google. This includes the substance of the user's interactions, together with persistent identifiers such as

13

the user's DSID and IDE cookies, thereby capturing the user's PHI without the user's knowledge or consent.

49. At the same time, DoubleClick trackers capture and transmit users' IP addresses along with their browsing activity. These IP addresses are stored in Google's systems, including server logs, and are combined with cookie-based identifiers to further distinguish and track individual users across websites.

50. By combining IP address data with persistent cookie identifiers, DoubleClick enables the identification of users at the individual or household level. This allows Google to associate users' browsing activity on axiawh.com—including granular healthcare-related searches, selections, and interactions—with broader behavioral profiles used for tracking and targeted advertising.

### C.    The Trade Desk Pixel

51. The Trade Desk offers website owners like Axia a tracking pixel known as the Trade Desk Pixel ("TDP"). When embedded on a website, TDP operates as a third-party tracker that monitors, captures, and collects users' interactions with the website in real time, including the pages users view, the links and services they select, the searches they perform, and the information they enter into website fields. Through this process, Trade Desk acquires users' PHI for its own commercial purposes.

52. When TDP is installed on a website, the pixel code connects the website to Trade Desk's platform. As a user's browser loads and interacts with the website, the embedded code communicates with Trade Desk's servers, including those hosted at adsrvr.org, and causes Trade Desk to deploy tracking technologies, including the TDID cookie, onto the user's device.

53.    Trade Desk assigns a unique identifier to each user through these tracking technologies, allowing it to recognize and monitor the same user across multiple websites that also embed TDP. In doing so, Trade Desk collects and aggregates user activity—including activity originating from axiawh.com—to build detailed behavioral profiles and deliver targeted advertising as users browse the internet, meaning Trade Desk captures users' PII as well.

54.    Although Trade Desk does not require users to log into an account to enable tracking, its persistent identifiers allow it to consistently recognize the same user and device across sessions. When a user provides PII on any website incorporating TDP—such as a name, email address, home address, or payment information—Trade Desk can associate that identifying information with the user's tracked browsing activity, thereby linking previously collected behavioral data to a specific individual.

55.    When users interact with axiawh.com—such as by searching for healthcare services or selecting providers—TDP embedded on the website contemporaneously captures and transmits those interactions, together with persistent identifiers such as the TDID cookie, to Trade Desk's servers. This process results in the collection of users' healthcare-related searches and interactions without their knowledge or consent.

56.    Trade Desk uses this information to create personalized advertising experiences, analyze advertising performance, refine targeting strategies, and associate user activity across different websites.

57.    The data collected by Trade Desk is further used to map relationships between devices that are likely associated with the same individual or household, enabling cross-device tracking and increasing the effectiveness of targeted advertising.

58.     Trade Desk also uses data captured through TDP to train and improve its artificial intelligence systems, including its Koa platform, which is designed to optimize programmatic advertising.

59.     By embedding TDP on its website, Axia enables the real-time collection and use of users' PII and PHI by Trade Desk, which it then leverages for its own marketing and advertising purposes.

### D.     Adobe Marketo Engage Munchkin

60.     Marketo Engage ("Marketo"), owned by Adobe, Inc., offers website owners like Axia a tracking script called Munchkin. Through Munchkin, Marketo monitors user activity, including what pages users view, what links and services they click on, what they search for, and what data they input into website systems. Munchkin thus allows Adobe to monitor and collect, and use for pecuniary gain, the PHI of Website visitors, including Plaintiff and other Class Members.

61.     When Munchkin is installed on a website, the script connects the website to the Marketo marketing automation platform. When a browser loads the site, the code instructs Marketo to assign a unique identifier to the user and deploy its tracking cookie, _mkto_trk, through its servers.

62.     Marketo assigns a unique identifier to each user, which allows it to track activity across any websites that also embed Munchkin. In doing so, Marketo can, including by monitoring activity originating from axiawh.com, build detailed behavioral profiles of users and feed that information into marketing automation campaigns, including targeted email and advertising programs.

63.    Because Munchkin functions as a marketing intelligence tracker, it is designed to bridge anonymous web browsing activity with known contact records. When a user provides personally identifying information, whether on axiawh.com or any other Marketo-integrated website or form, Marketo will associate the user's entire prior and subsequent browsing history, across any Munchkin-embedded site, with their identified contact record. Thus, Munchkin also collects users' PII. This also means a user's search for a specific medical specialty, selection of a particular provider, or navigation of sensitive health-related pages on axiawh.com can be linked both retroactively and prospectively to their real identity within Marketo's platform.

64.    The data collected by Munchkin is used by Marketo and its customers, like Axia, to create personalized marketing experiences, automate targeted communications, analyze user engagement, and refine audience segmentation for advertising campaigns. This includes the ability to trigger automated email campaigns or other marketing outreach directly as a result of a user's browsing activity on axiawh.com.

65.    Axia benefits from the installation of Munchkin on the Website. By enabling Munchkin, Axia is able to track user interaction with axiawh.com and associate that browsing behavior with identified patient records to improve and broaden its own marketing.

**E.    HubSpot**

66.    HubSpot, Inc. provides website owners like Axia a suite of tracking and marketing automation tools, deployed through a JavaScript tracking code loaded via HubSpot's hs-scripts.com servers. Using these tools, HubSpot monitors user activity, including what pages users view, what links and services they click on, what elements they interact with, and what they search for. These tools thus allow HubSpot to eavesdrop on, collect, and use for pecuniary gain the PII and PHI of Website users, including Plaintiff and other Class Members.

17

67.     When HubSpot's tracking code is installed on a website, it deploys multiple tracking mechanisms. When a browser loads the site, HubSpot assigns each visitor a unique identifier and sets the "hubspotutk" cookie, which persists across browsing sessions and is used to identify returning visitors. HubSpot also deploys the __hstc, __hssc, and __hssrc cookies, which together track the visitor's session history, visit count, and referral source across their entire engagement with the website.

68.     HubSpot's tracking goes beyond page-level data. Its __ptc.gif and __ptq.gif tracking pixels, served through track.hubspot.com, are triggered by specific user interactions—including clicking on individual providers on axiawh.com's "Find Care" page—and transmit granular event-level data to HubSpot's servers. This data includes the specific HTML element the user clicked, the text content of that element, and the URL of the page on which the interaction occurred. As a result, HubSpot receives data showing, not merely that a user visited a page, but precisely which provider, specialty, or service the user expressed interest in by clicking.

69.     Additionally, when users navigate to axiawh.com's site search function and enter a search term, HubSpot's analytics tracking transmits the search URL, including the specific search term entered, to HubSpot's servers. This means that a user's search for a particular health condition, service, or term (for example, the search query "abortion") is captured by HubSpot and associated with that user's persistent HubSpot identifier and contact record.

70.     Because HubSpot functions as both a web analytics and Customer Relationship Management ("CRM") platform, it is specifically designed to bridge anonymous web browsing activity with identified contact records. When a user provides personally identifying information, whether through a form on axiawh.com or through any other HubSpot-integrated channel, HubSpot will associate that person's entire prior and subsequent browsing history with their

18

identified CRM record. This means that a user's navigation of sensitive health-related pages, selection of specific providers, or searches for particular medical services on axiawh.com can be retroactively and prospectively linked to their real identity within HubSpot's platform.

71. The data collected by HubSpot is used by HubSpot and its customers to build detailed contact profiles, automate targeted marketing communications, score and segment audiences based on behavioral signals, and deliver personalized advertising. This includes the ability to trigger automated outreach, such as targeted emails or advertisements, directly as a result of a specific user's browsing activity on axiawh.com, including care providers they clicked on or search terms they queried.

72. Axia also directly benefits from the installation of HubSpot's tracking code on the Website. By enabling HubSpot's trackers, Axia is able to associate individual patients' browsing behavior on axiawh.com with their CRM records and use that information to improve and broaden its own marketing.

## IV.   THE UNDISCLOSED EAVESDROPPING BY THIRD PARTIES ON AXIA WEBSITE USERS VIOLATES HIPAA AND INDUSTRY STANDARDS, AND WEBSITE USERS' PRIVACY RIGHTS

73. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.

74. Guidance from the United States Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.[4]

---

[4] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

75.    Third parties, including Google, Trade Desk, Adobe, and HubSpot, through the tracking tools described herein and others Axia may have used on the Website, track users and collect their data (including PII and PHI), transmitting that information to their servers in real time. Thus, third parties eavesdrop on Axia Website patient-visitors, and because Axia installed the trackers, it knowingly enables this interception.

76.    In Guidance regarding Methods for De-identification of PHI in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data . . . . If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.

77.    Axia allows undisclosed eavesdropping, purposely sharing its patients' PII and PHI with third parties, and makes minimal effort to safeguard user privacy through de-identification methods, in contravention of the guidance principles promulgated by HHS.

78.    In its guidance for marketing, HHS also instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.

79.    Medical providers' duty of confidentiality is a core tenet of the physician-patient, and hospital-patient relationship. Axia nevertheless failed to disclose its tracking of patients' data for commercial gain, or obtain consent before doing so. Thus, Axia's conduct was and is in violation of the HIPAA Privacy Rule.

80.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications online.

81.    The AMA has also promulgated a list of principles that provide the framework for protecting patient privacy online. Many policies pertain to individual rights of patient-users online, including the right to "know exactly what data of theirs an entity is accessing, using, disclosing, and processing—and for what purpose—at or before the point of collection." Given that Axia Website users are not informed of this, Axia is acting in violation of AMA ethical standards.

82.    The rules and prohibitions governing disclosure of health information are not merely aspirational. The unauthorized disclosure of individually identifiable health information in violation of HIPAA is unlawful and subject to criminal enforcement under federal law. HIPAA's Administrative Simplification provision criminalizes the knowing and unauthorized disclosure of individually identifiable health information by a covered entity, like Axia. The statute defines the offense, in relevant part, as "a person who knowingly . . . discloses individually identifiable health information to another person," 42 U.S.C. § 1320d-6(a)(3).

83.    Violations can result in criminal fines and even prison sentences, with higher penalties for malicious intent or false pretenses.

84.    Accordingly, any purported "consent" by Axia to the interception or disclosure of such information for marketing purposes is in furtherance of unlawful conduct. Thus, the one-party consent exception of 18 U.S.C. § 2511(2)(d) does not apply.

85.    The interception of patients' PII and PHI without consent, which Axia procured, exemplifies the utmost invasion of privacy and would be highly offensive to any reasonable person. These invasions of privacy are particularly offensive given that third parties like Google, Trade Desk, Adobe, and HubSpot intentionally intercept users' PHI for financial gain through

better targeting of advertisements, that Axia permits these invasions of privacy for its own financial gain, and that Axia provides no mechanism for Website users to opt out of tracking before it occurs.

## V.    PLAINTIFF'S USE OF AXIAWH.COM

86.    Between approximately June 2025 and September 2025, Plaintiff used the Axia Website and Axia Patient Portal, on both her phone and computer, to search for care providers, to request and make medical appointments, and to pay her medical bills.

87.    At various times, Plaintiff used the "Find Care Near You" page and entered her zip code into the search function.

88.    Through the tracking tools described herein, and other tools Axia may have used during the Class Period, third parties like Google, Trade Desk, Adobe, and HubSpot monitored Plaintiff's use of the Website in real time. As a result, Plaintiff's messages, reports, and communications on the Website were instantly transmitted to and available for use by these third parties. Everything Plaintiff browsed or searched on the Website was, without notice or permission, tracked and intercepted by these third parties instantly and automatically in real-time.

89.    Shortly after using the Website, Plaintiff received targeted advertisements concerning women's health.

90.    Each time Plaintiff used the Website, Axia allowed third parties to intercept, learn the contents of, and use for commercial gain Plaintiff's messages, reports, and communications.

91.    Because Plaintiff's messages, reports, and communications were intercepted simultaneously as they were being communicated, these interceptions occurred while the messages, reports, and communications were in transit.

92.    The third parties who intercepted them, like Google, Trade Desk, and Adobe, and HubSpot, were never parties to the messages, reports or communications between Plaintiff and

Axia. Plaintiff did not know her messages, reports, or communications on the Website would be intercepted by any third parties.

93.     Plaintiff did not know her PHI combined with her individual identifiers would be intercepted, used, or sold by third parties.

94.     Plaintiff did not consent to her messages, reports, or communications on the Website being intercepted by third parties.

95.     When visiting the Website, Plaintiff was unaware she was being tracked. Plaintiff did not have the ability to opt out of having her personal information on the Website shared with third parties for commercial gain.

96.     Plaintiff reasonably believed her messages, reports, and communications with Axia on the Website, including the PHI contained therein, were private. Plaintiff was generally aware of Axia's duty of confidentiality and reasonably expected that the private information she provided, including her PII and PHI, would remain private and would not be shared with third parties for commercial purposes unrelated to patient care.

97.     Axia's procurement of unauthorized interceptions of Website user communications has caused actual harm to Plaintiff and other Class Members.

98.     Plaintiff and other Class Members' private and personal data, including their protected health information, IP addresses, and digital identifiers, have a recognized monetary value in today's digital economy. For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest Internet companies earn hundreds of dollars per American user through the interception and use of personal data.

99.     A 2014 Federal Trade Commission report, for example, found data brokers sell data in sensitive categories, particularly health information, for a premium.[5] In 2022, the FTC brought a lawsuit against a data broker for selling location data regarding people who visit abortion clinics, valued at approximately $160 per person for a week's worth of data.[6] And in a recent trial prosecuted by the New Mexico Attorney General, one industry expert testified Meta Platforms, Inc. derives approximately $270 in annual advertising revenue per teenage user based on the monetization of that user's digital profile, behavioral data, and identifiers.

100.    The value of health data in particular is well-known and has been reported extensively. A 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," for example, described the market for health data as both lucrative and a significant risk to privacy.[7]

101.    Due to the difficulty in obtaining personal and sensitive health information, illegal markets also exist for it. NPR has reported health data can be "more expensive than stolen credit card numbers."[8]

102.    In sum, individuals' online personas, including identifiers, browsing behavior, and health-related inferences, are monetizable assets in the modern digital advertising economy. Axia thus misappropriated data that carries measurable economic value in established markets.

---

[5] "Data Brokers: A Call for Transparency and Accountability," Fed. Trade Comm'n (May 2014).

[6] *Fed. Trade Comm'n v. Kochava Inc.*, No 2:22-cv-377 (D. Idaho, filed Aug. 29, 2022).

[7] Adam Tanner, "Our Bodies, Our Data: How Companies Make Billions Selling Our Medical Records," *Time.com* (Jan. 9, 2017), *at* https://time.com/4588104/medical-data-industry.

[8] Aarti Shahani, "The Black Market For Stolen Health Care Data," *NPR.org* (Feb. 13, 2015), *at* https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data.

103. The third party interceptions of Plaintiff and other Class Members' PII and PHI without consent, which Axia procured, has deprived Plaintiff and other Class Members of the economic value of their personal property without proper consideration, and has resulted in Axia being unjustly enriched at their expense.

104. Moreover, medical and health-related information is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiff and other Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. These communications included searching for medical specialists, scheduling medical appointments, and paying medical bills. The interception of these communications violated Plaintiff and other Class Members' reasonable expectation that their interactions with a healthcare provider would remain private.

105. Axia's conduct has also undermined patient trust generally and created a chilling effect on digital healthcare communications. This chilling effect may lead to reluctance to seek needed healthcare information or services online, potentially even impacting health outcomes.

106. Once intercepted by third parties, Plaintiff and other Class Members' data is beyond their control and may be used in perpetuity for commercial gain. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

## CLASS ACTION ALLEGATIONS

107. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States who, at any time from four years

25

preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), interacted with axiawh.com while it was embedded with cookies and/or pixel trackers that instantaneously conveyed users' PII or PHI to third parties (the "Class").

108. The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class in a single action will provide substantial benefits to the parties and the Court.

109. Questions of law and fact common to Plaintiff and the Class include but are not limited to:

a. Whether Axia, through embedded cookies and/or pixel trackers on axiawh.com, collected PII or PHI;

b. Whether Axia disclosed to any third parties the PII or PHI of Class Members, or messages, reports, and communications between itself and Class Members;

c. Whether Axia procured any third parties to intercept Class Members' electronic communications on axiawh.com;

d. Whether the interception, disclosure, use, sharing, and sale of Class Members' sensitive personal data for targeted advertising as alleged herein is unconscionable to a reasonable person;

e. Whether Axia owed Plaintiff and other Class Members a duty of care;

f. Whether Axia breached that duty of care;

g. Whether Axia was unjustly enriched;

h. The proper amount of compensatory and punitive damages to which the Class is entitled; and

i. Any equitable relief to which the Class is entitled.

110. These common questions of law and fact predominate over questions that affect only individual Class Members.

111. Plaintiff's claims are typical of the Class's claims because they are based on the same underlying facts, events, and circumstances relating to Axia's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same violations of privacy and other unlawful and unfair business practices as a result of using axiawh.com.

112. Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, who will vigorously prosecute this action and will otherwise protect and fairly and adequately represent Plaintiff and the Class.

113. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for each Class Member to redress the wrongs done to them.

114. Defendants have acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

115. As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Violation of the Electronic Communications Privacy Act**

**18 U.S.C. §§ 2510,** *et seq.* **("ECPA")**

116.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

117.    The ECPA provides a private right of action to "any person whose . . . electronic communications are intercepted, disclosed, or intentionally used in violation of" the Act. 18 U.S.C. § 2520(a). The Act prohibits both (a) intentionally intercepting, disclosing, or procuring another person to intercept any electronic communication, and (b) intentionally disclosing the contents of any electronic communication knowing that the information was obtained through unlawful interception. 18 U.S.C. § 2511(1)(a), (c).

118.    "Contents" includes "any information concerning the substance, purport, or meaning of [a] communication." *Id.* § 2510(8).

119.    Here, intercepted data includes, *inter alia*, patients' searches for specific medical specialties, conditions, and providers, which communicate the substance and meaning of patients' healthcare needs and therefore constitute "contents" within the meaning of 18 U.S.C. § 2510(8).

120.    The transmissions by Plaintiff and other Class Members of their PII and PHI to axiawh.com were "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

121.    Axia violated ECPA in two ways.

122.    First, Axia disclosed the contents of Plaintiff and other Class Members' electronic communications to third parties. Axia operates as a covered healthcare provider under HIPAA, and the information patients input on the "Find Care Near You" page—including zip code, selected

28

medical specialty, and provider preferences—as well as the information patients enter when scheduling appointments—including full name, date of birth, phone number, email address, and type of appointment—is communicated directly by patients to Axia in the context of seeking care.

123. The trackers Axia has installed on the Website embed persistent, unique identifiers in each user's browser and transmit it to the trackers' third party owners, along with the user's IP address and page-level data. When these unique identifiers travel in the same payload as the specialty preferences, conditions, and appointment information a user enters on axiawh.com, the combined dataset constitutes individually identifiable health information ("IIHI")[9] and PHI, because the identifiers can be used by third parties to single out the individual whose health data is implicated. Axia's transmission of that data therefore constitutes both a "disclosure" under ECPA, and a disclosure of IIHI and PHI under HIPAA. *See* 45 C.F.R. §§ 160.103, 164.502(a), 164.514(b)(2).

124. Second, Axia procured third parties to intercept those communications. Axia made the affirmative decision to implement trackers on its website, deliberately copying relevant tracking code into axiawh.com's source code (via GTM). Axia controls which pages contain some or all trackers, could exclude them from sensitive pages where healthcare information is accessed, and could remove or modify them at any time, but has chosen not to do so. Axia's continued deployment of these trackers across the sensitive areas of its Website represents an ongoing,

---

[9] IIHI is information, including demographic data, that relates to the individual's past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual, including common identifiers like name, address, birth date, or Social Security Number. *See* U.S. Dep't of Health & Human Servs., Health Information Privacy Laws and Regulations, https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

deliberate choice to procure third parties to intercept the electronic communications of its patients, in violation of 18 U.S.C. § 2511(1)(a).

125.   The one-party consent exception of § 2511(2)(d) does not apply because any purported "consent" to third-party interception violated HIPAA's criminal provision, which prohibits knowingly disclosing IIHI. 42 U.S.C. § 1320d-6(a)(3). Because Axia's consent to third party interception was given for the purpose of committing this criminal act, the consent exception is unavailable.

126.   Plaintiff and other Class Members did not consent to Axia's disclosure of their private communications, nor could they have, as they were unaware these interceptions occurred concurrently with their use of axiawh.com. Moreover, Axia did not provide Plaintiff or Class Members any opportunity to opt out of the disclosure of their private communications to third parties.

127.   Plaintiff and other Class Members suffered harm as a result of Axia's violations of the Act, and seek (a) preliminary, equitable, and declaratory relief as may be appropriate, (b) the greater of actual damages and Axia's profits from its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), (c) punitive damages, and (d) reasonable costs and attorneys' fees.

**SECOND CAUSE OF ACTION**

**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act**

**18 Pa. C.S. §§ 5701, *et seq*. (WESCA)**

128.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

129.    WESCA, codified at 18 Pa. C.S. §§ 5701-5782, makes it unlawful for any person to intentionally: (1) intercept any wire, electronic, or oral communication; (2) disclose to any other person the contents of any such communication knowing or having reason to know the information was obtained through interception; or (3) use or endeavor to use the contents of any such communication knowing or having reason to know it was obtained through interception. 18 Pa. C.S. § 5703(1)-(3).

130.    WESCA provides a civil cause of action against any person who intercepts, discloses, uses, or procures any other person to intercept, disclose, or use a covered communication. 18 Pa. C.S. §§ 5725(a)(1)-(3).

131.    When Plaintiff and other Class Members used axiawh.com, they transmitted electronic communications to Axia. Those communications included, *inter alia*, searches for care providers, selection of health services, scheduling of appointments, and submission of payment information. Each such interaction constituted an electronic communication containing "contents" within the meaning of WESCA, including information reflecting users' identities, health conditions, treatment needs, and financial information. *See* 18 Pa. C.S. § 5702.

132.    By installing and maintaining trackers on axiawh.com, and pursuant to its commercial agreements with third parties under which Axia exchanged access to users' communications and data for access to improved advertising, Axia both disclosed the contents of Plaintiff and other Class Members' electronic communications, and procured third parties to intercept and use those communications, thereby subjecting itself to liability under 18 Pa. C.S. § 5725(a) to the same extent as if it had performed the interception itself.

133.    WESCA requires the prior consent of all parties before a communication may be intercepted by or disclosed to a third party. 18 Pa. C.S. § 5704(4). Axia obtained no such consent,

31

as Plaintiff and other Class Members were never informed their communications would be simultaneously transmitted to third parties.

134.   As a direct and proximate result of Axia's violations of WESCA, Plaintiff and other Class Members suffered harm, including the unauthorized disclosure of their electronic communications, the exposure of their PII and PHI to third parties, and the loss of their privacy and financial interests in their medical communications.

135.   Pursuant to 18 Pa. C.S. § 5725(a), Axia is liable for: (1) actual damages, but not less than liquidated damages of $100 per day for each day of violation, or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and litigation costs.

## THIRD CAUSE OF ACTION

### Negligence

136.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

137.   Axia owed Plaintiff and other Class Members a duty of care, to protect their PII and PHI from unauthorized disclosure. This duty arises from at least two independent sources.

138.   First, Axia's duty arises from the special relationship between a healthcare provider and its patients. The physician-patient relationship imposes a duty of confidentiality that is among the most fundamental obligations in medicine, recognized at common law, codified in HIPAA and its implementing regulations, and reflected in the AMA's ethical standards. This duty exists independently of any contract between the parties and requires Axia to take reasonable steps to prevent the unauthorized disclosure of patients' health information to third parties.

139.   Second, Axia's duty arises from the foreseeable risk of harm. Axia knew or should have known that embedding third-party tracking technology on a healthcare website would result

in the transmission of patients' sensitive health information to third parties, and that such a disclosure could cause significant harm to patients, including the invasion of their privacy, the loss of their control over their sensitive medical information, and the chilling of their willingness to seek healthcare.

140.    Axia breached these duties by embedding trackers on axiawh.com, thereby causing the automatic and invisible transmission of Plaintiff and other Class Members' PII and PHI to third parties in real time, without their knowledge or consent, and for commercial advertising purposes.

141.    Axia's breach reflects a reckless disregard for patients' privacy rights. Axia had complete control over its Website and could have excluded such trackers from sensitive pages or removed them entirely, but failed to do so.

142.    As a direct and proximate result of Axia's negligence, Plaintiff and other Class Members have sustained actual damages, including the loss of the economic value of their personal health information, which was transmitted to and exploited by third parties without their consent or compensation; and the invasion of their privacy, together with the attendant emotional distress, anxiety, and loss of trust arising from the disclosure of their sensitive medical information to commercial third parties.

143.    As a direct and proximate result of Axia's negligence, Plaintiff and other Class Members have sustained damages in a sum to be determined at trial, including compensatory damages for invasion of privacy, emotional distress, and loss of the value of their personal health information.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

144. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

145. Plaintiff and other Class Members conferred direct and measurable economic benefits on Axia in the form of their PII and PHI, which Axia knowingly intercepted, collected, and monetized. These benefits include profits and revenue derived from using Plaintiff and other Class Members' PII and PHI to optimize Axia's marketing efforts and enable targeted advertising—activities that would not have been possible, or would have been significantly less profitable, without access to Plaintiff and other Class Members' PII and PHI.

146. Axia appreciated and consciously accepted these benefits. Axia deployed tracking technologies precisely because the data they capture has substantial commercial value to Axia. Axia knew the PII and PHI intercepted through these trackers was not freely given, that it belonged to Plaintiff and other Class Members, and that it was being used to generate revenue without authorization or compensation.

147. The financial benefits Axia obtained are directly and economically traceable to the interception and use of Plaintiff and other Class Members' PII and PHI without their knowledge or consent.

148. It would be inequitable, unconscionable, and unjust to permit Axia to retain these economic benefits. Axia procured them through deliberate, covert conduct—embedding tracking technologies on its Website without adequate disclosure or consent—and profited at Plaintiff and other Class Members' expense. Plaintiff and other Class Members received nothing in return for

the commercial value of their data, while Axia reaped the financial rewards. Retaining these ill-gotten benefits would allow Axia to profit from its own wrongdoing, which equity does not permit.

149.    As a result, Plaintiff and other Class Members are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Axia as a result of its inequitable business practices.

## **PRAYER FOR RELIEF**

150.    Wherefore, Plaintiff, individually and on behalf of the proposed Class, prays for judgment as follows:

a.    An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

b.    An Order requiring Defendant to bear the cost of Class Notice;

c.    An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

d.    An Order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful or unfair business act or practice;

e.    An Order requiring Defendant to pay statutory, compensatory, and punitive damages as permitted by law;

f.    An Order enjoining Defendant from allowing third parties to intercept, learn the contents of, and profit from private communications between users and axiawh.com without the users' consent;

g.    A judgment awarding any and all further equitable, injunctive, and declaratory relief as may be appropriate;

h.    Pre- and post-judgment interest, as permitted by law;

i.    An award of attorney fees and costs; and

j.    Such further relief as the Court deems necessary, just, or proper.

## JURY DEMAND

151.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 14, 2026                    /s/ Michael J. Kenny

**LAW OFFICES OF MICHAEL J. KENNY**
MICHAEL J. KENNY (Bar No. 81623)
550 Colfax Ave.
Scranton, PA 18510
Phone: (570) 241-1667

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (*Pro Hac Vice Forthcoming*)
*jfitzgerald@fmfpc.com*
TREVOR FLYNN (*Pro Hac Vice Forthcoming*)
*tflynn@fmfpc.com*
MELANIE MONROE (*Pro Hac Vice Forthcoming*)
*mmonroe@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***