**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NELI MEDVEDEVU, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>REGIONAL WOMEN'S HEALTH GROUP, LLC,<br><br>Defendant. | Case No.: 2:26-cv-02455 |

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... ii

STATEMENT OF ISSUES TO BE DECIDED ..... 1

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. PLAINTIFF HAS ARTICLE III STANDING ..... 3

II. PLAINTIFF PLAUSIBLY ALLEGES AXIA VIOLATED THE ECPA ..... 8

A. Plaintiff Alleges Interception of the Contents of Her Communications ..... 9

B. Plaintiff Plausibly Alleges Contemporaneous Interception ..... 11

C. Axia's "Device" Argument Ignores Plaintiff's Procurement Theory and the Devices Alleged ..... 12

D. The One-Party-Consent Defense Does Not Defeat the ECPA Claim ..... 14

III. PLAINTIFF PLAUSIBLY ALLEGES A VIOLATION OF WESCA ..... 16

IV. PLAINTIFF PLAUSIBLY ALLEGES NEGLIGENCE ..... 19

A. Axia Owed Plaintiff a Duty to Protect Her Private Health Information ..... 19

B. Plaintiff Alleges Breach ..... 20

C. Plaintiff Alleges Causation and Damages ..... 21

V. PLAINTIFF PLAUSIBLY ALLEGES UNJUST ENRICHMENT ..... 22

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

## Cases

*Adair v. Cigna Corp. Servs., LLC*,
818 F. Supp. 3d 641 (E.D. Pa. 2026) .......... 6

*Brunecz v. Warren General Hospital*,
2026 WL 2043024 (W.D. Pa. July 15, 2026) .......... passim

*Commonwealth v. Cole*,
167 A.3d 49 (Pa. Super. Ct. 2017) .......... 18

*Connelly v. Lane Constr. Corp.*,
809 F.3d 780 (3d Cir. 2016) .......... 12

*Cook v. GameStop, Inc.*,
148 F.4th 153 (3d Cir. 2025) .......... 5, 6, 10

*Cook v. GameStop, Inc.*,
689 F. Supp. 3d 58 (W.D. Pa. 2023) .......... 10, 18

*Dittman v. UPMC*,
196 A.3d 1036 (Pa. 2018) .......... 20

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
11 F.4th 200 (3d Cir. 2021) .......... 8

Finkelman v. Nat'l Football League,
810 F.3d 187 (3d Cir. 2016) .......... 8

*Fraser v. Nationwide Mutual Insurance Co.*,
352 F.3d 107 (3d Cir. 2003) .......... 11

*Hartley v. Urban Outfitters, Inc.*,
740 F. Supp. 3d 410 (E.D. Pa. 2024) .......... 4

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .......... 9, 10, 14, 17

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017) .......... 3, 4, 7

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 4, 7

*In re Rutter's Inc. Data Sec. Breach Litig.*,
511 F. Supp. 3d 514 (M.D. Pa. 2021) .......... 21

*Mason v. Machine Zone, Inc.*,
140 F. Supp. 3d 457 (D. Md. 2015) .......... 13

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*,
2023 WL 7017734 (E.D. Pa. Oct. 10, 2023) .......... 17, 18

*Potter v. Havlicek*,
2008 WL 2556723 (S.D. Ohio June 23, 2008) .......... 13

*Santoro v. Tower Health*,
2024 WL 1773371 (E.D. Pa. Apr. 24, 2024) .......... 19, 20

*Smart v. Main Line Health*,
2024 WL 2943760 (E.D. Pa. June 10, 2024) .......... 14

*Smart v. Main Line Health*,
2026 WL 1008171 (E.D. Pa. Apr. 14, 2026) .......... 14, 15

*Tignor v. Dollar Energy Fund, Inc.*,
745 F. Supp. 3d 189 (W.D. Pa. 2024) .......... 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 3, 7

*Zimmerman v. Highmark, Inc.*,
780 F. Supp. 3d 588 (W.D. Pa. 2025) .......... 19

**Statutes**

18 U.S.C. § 2510(4) .......... 11

18 U.S.C. § 2510(5) .......... 13

18 U.S.C. § 2510(8) .......... 10

18 U.S.C. § 2511(1)(a) .......... 8, 16

18 U.S.C. § 2511(1)(c) .......... 16

18 U.S.C. § 2511(2)(d) .......... 14

42 U.S.C. § 1320d-6(a)(3) .......... 15

42 U.S.C. § 1320d-6(b)(3) .......... 15

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiff has Article III standing where she alleges that Defendant Axia caused third parties to intercept and obtain her private healthcare communications, PII, PHI, and digital identifiers without authorization.

2. Whether Plaintiff states an ECPA claim where Axia embedded third-party tracking code that contemporaneously intercepted the substance of her healthcare communications and transmitted them, together with persistent identifiers, to third parties.

3. Whether Axia's one-party-consent defense fails where Axia procured the interception for the separate purpose of knowingly disclosing individually identifiable health information for commercial advertising, in violation of HIPAA's criminal provisions.

4. Whether Plaintiff states a WESCA claim where § 5703(1) does not separately require interception of a communication's "contents," and where she alleges real-time, contemporaneous interception at her browser.

5. Whether Plaintiff states a negligence claim where Axia owed its patient a duty to safeguard private medical information and its deliberate deployment of third-party trackers caused privacy, emotional, and economic harm.

6. Whether Plaintiff states an unjust enrichment claim where Axia deployed tracking technologies to derive commercial value from her PII and PHI, used that information to optimize its marketing, and retained the benefit without compensation.

## INTRODUCTION

Axia's motion rests on the flawed premise that because Plaintiff does not identify in her Complaint the medical condition she researched, provider she selected, data packet transmitted,

and advertisement she later received, the Court must decline to credit her allegations that Axia caused third parties to intercept her private healthcare communications in real time. This misreads Rule 8 and demands evidentiary detail beyond what the pleading stage requires.

Plaintiff alleges that, between June and September 2025, she used Axia's Website and Patient Portal on her phone and computer to search for care providers, request and make medical appointments, and pay medical bills, and that she entered her ZIP code into Axia's "Find Care Near You" function. Compl. ¶¶ 86-87. Third-party trackers monitored that activity in real time and transmitted her messages, reports, searches, and communications to Google, The Trade Desk, Adobe, and HubSpot while they were in transit, combining her PHI with individual identifiers. *Id.* ¶¶ 88-95. Shortly afterward, she received targeted advertisements concerning women's health. *Id.* ¶ 89.

The Complaint also explains in detail how the technologies Axia selected and installed perform these interceptions and how Axia commercially benefits from them. *Id.* ¶¶ 29-75. Axia deployed these technologies through Google Tag Manager, controlled where they operated, and could have—but failed to—remove them from sensitive pages. *Id.* ¶¶ 29-31, 124, 141.

Rather than accept these allegations as true, Axia repeatedly recasts them as descriptions of what tracking technology is merely "capable" of doing and demands evidentiary detail concerning the communications intercepted from Plaintiff. Mot. at 1-3, 6-10. But Plaintiff need not, before discovery, plead with precision what appears in Axia's server logs, its vendors' advertising records, or the network payloads generated by covert tracking technologies.

The recent decision in *Brunecz v. Warren General Hospital*, 2026 WL 2043024 (W.D. Pa. July 15, 2026), rejects many of Axia's premises. Addressing materially similar healthcare-tracking allegations, the court rejected the defendant's attempt to characterize the intercepted

information as innocuous "website usage data." *Id.*, at *4-5. It held that allegations concerning patient status, portal activity, healthcare-provider searches, medical services viewed, and associated identifiers plausibly implicated "individually identifiable health information that falls within the ambit of information protected under HIPAA." *Id.*, at *5, *8. Those allegations established a concrete injury for Article III purposes and support claims for negligence and unjust enrichment. *See id.*, at *7-10, *11-12.

*Brunecz* is especially consequential for Axia's WESCA argument. The court held that a claim under Section 5703(1) "does not require the interception of the 'contents' of a communication." *Id.*, at *13. It further held that, even if contents were required, their acquisition could plausibly be inferred from allegations that tracking technologies broadly recorded users' website interactions. *Id.*, at *13-14. It also held that tracking code operating through a user's computer or remote servers plausibly qualifies as an intercepting "device." *Id.*, at *14.

The Court should apply the sound reasoning of *Brunecz* and deny Axia's motion.

## ARGUMENT

### I. PLAINTIFF HAS ARTICLE III STANDING

Axia's standing argument depends on disregarding Plaintiff's allegations that her private healthcare information was intercepted and disclosed without her consent. Mot. at 5-11. But Axia presents a facial Rule 12(b)(1) challenge, so the Complaint's well-pleaded allegations must be accepted as true and construed in Plaintiff's favor. *See In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632-34 (3d Cir. 2017) ["*Horizon*"].

Article III requires a concrete and particularized injury fairly traceable to the defendant. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Intangible harms may be concrete, including harms closely related to traditionally recognized privacy injuries. *Id.* at 425. The Third

Circuit has recognized that unauthorized disclosure of information Congress determined should remain private may constitute concrete injury. *Horizon*, 846 F.3d at 638 ("unauthorized disclosures of information" have long been seen as injurious) (citation modified) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) ["*Nickelodeon*"]). Axia concedes that "disclosure of sensitive health information could resemble a traditionally actionable privacy harm . . .." Mot. at 6. It nevertheless asks the Court to disregard Plaintiff's allegations that such a disclosure happened to her.

Plaintiff alleges that she is an Axia patient who used Axia's Website and Patient Portal to search for healthcare providers, make medical appointments, and pay medical bills. Compl. ¶ 86. While she did so, third-party trackers monitored her Website activity in real time and instantly transmitted her communications to third parties. *Id.* ¶¶ 88-91. The intercepted information included PHI combined with individual identifiers. *Id.* ¶ 93. Shortly after using the Website, Plaintiff received targeted advertisements concerning women's health. *Id.* ¶ 89.

Those Plaintiff-specific allegations must be read together with the Complaint's detailed explanation of how the trackers operate on Axia's Website. Google Analytics captures search queries and provider selections together with IP addresses in real time. *Id.* ¶¶ 33-35. DoubleClick combines healthcare-related activity with persistent cookie identifiers. *Id.* ¶¶ 45-50. HubSpot captures providers selected and search terms entered and links that browsing activity to identified Customer Relationship Management records. *Id.* ¶¶ 66-72. The Complaint thus alleges both how the technologies operated and that they actually operated in that manner when Plaintiff used Axia's Website.

Axia's reliance on *Hartley v. Urban Outfitters, Inc.*, 740 F. Supp. 3d 410 (E.D. Pa. 2024), Mot. at 4, 7, rests on artificially separating these allegations. Plaintiff does not allege merely that

the technologies were capable of interception. She alleges that specific third parties monitored her activity in real time, instantly received her communications, combined her PHI with individual identifiers, and used the information for commercial gain. Compl. ¶¶ 33-75, 88-95. Those are allegations of conduct. Plaintiff was not required to repeat in paragraph 88 every technical allegation pleaded in paragraphs 29 through 75.

*Brunecz* confirms that unauthorized disclosure of private medical information through healthcare-tracking technologies constitutes a concrete injury. 2026 WL 2043024, at *6-7. Applying *Horizon* and *Nickelodeon*, the court held that "Plaintiffs' allegations concerning [the hospital's] unauthorized dissemination of their private medical information to third parties sufficiently allege a concrete injury for purposes of establishing Article III standing." *Id.*, at *7. It therefore denied the hospital's standing challenge to the plaintiffs' claims for monetary relief. *Id.*

Axia's attempt to distinguish *Brunecz*, Mot. at 8-10, is unavailing. Axia emphasizes that one plaintiff there received Cologuard advertisements immediately after searching for a colonoscopy provider. *Id.* at 9. But *Brunecz* did not make treatment-specific advertising an element of standing. The allegation merely supplied additional support for the inference that identifiable information had been disclosed. 2026 WL 2043024, at *6-7. Here, the unauthorized disclosure is itself the concrete privacy injury, and Plaintiff's subsequent receipt of women's-health advertising supplies corroboration. Compl. ¶ 89.

*Cook v. GameStop, Inc.*, 148 F.4th 153 (3d Cir. 2025) ["*Cook II*"] properly frames the standing inquiry in this Circuit, and its reasoning supports Plaintiff. There, the Third Circuit held the plaintiff lacked standing because the session-replay code captured ordinary retail browsing—time on site, mouse movement, clicks, scrolling, search-bar entries, and cart activity—on a

website where she supplied no name, contact information, address, or payment information, and because the resulting data traveled no further than the operator's own vendor. *Cook II*, 148 F.4th at 156, 159-61. The court nonetheless cautioned that its holding does not foreclose every website-tracking plaintiff from federal court. *Id.* at 162. And it distinguished *Nickelodeon* on the ground that GameStop disclosed its use of tracking in its privacy policy and never promised not to track. *Id.* at 160-61.

Each of those distinctions favors Plaintiff. She did not browse a retailer's catalog, but used her own healthcare provider's Website to locate women's-health providers, request and make medical appointments, and pay her medical bills. Compl. ¶ 86. The Website's search function presents more than a dozen discrete medical specialties—including fertility, maternal fetal medicine, breast health, genetics, and menopause solutions—so a user's selections convey the substance of the care she is seeking. *Id.* ¶¶ 14, 22-24. The alleged disclosures were not merely functionally internal transmissions to a service provider performing a limited task for Axia. Plaintiff alleges disclosures to five advertising and marketing companies that aggregate the data into cross-site commercial profiles and, in HubSpot's and Marketo's case, link it to identified contact records. *Id.* ¶¶ 29, 40-41, 53-54, 63, 70. And unlike *GameStop*, Axia disclosed nothing—neither its Privacy Policy nor its Notice of Privacy Practices states that third parties collect and monetize users' PII and PHI, and Axia offers no way to opt in or out. *Id.* ¶¶ 25-26.

*Adair v. Cigna Corp. Servs., LLC*, 818 F. Supp. 3d 641 (E.D. Pa. 2026), on which Axia relies, Mot. at 8, does not require more. *Adair* held the allegations before it sufficient, but did not hold that anything less must fail, and a decision sustaining one complaint does not convert its particular details into pleading elements. 818 F. Supp. 3d at 662-63. In any event, the features Axia extracts from *Adair* are present here in substance. The *Adair* plaintiffs used health portals to

research providers and services; Plaintiff used her provider's Website and Patient Portal to search for care providers, request and make appointments, and pay medical bills. Compl. ¶ 86. The *Adair* technologies captured information reflecting patient status, conditions, and providers; the trackers here captured Plaintiff's search queries, provider selections, and services viewed, and transmitted them with persistent identifiers capable of linking that activity to her. *Id.* ¶¶ 33-35, 40-41, 46-50, 63, 68-70, 88, 93.

Axia next argues that Plaintiff has not alleged an expenditure or other out-of-pocket loss. Mot. at 10. But Article III does not invariably require financial harm. *TransUnion* recognizes that intangible injuries—including traditional privacy harms—may be concrete. 594 U.S. at 425. And the Third Circuit holds that unauthorized disclosure may itself cause injury without additional financial loss or identity theft. *Horizon*, 846 F.3d at 638-41; *Nickelodeon*, 827 F.3d at 274.

Plaintiff does not rely on Axia's profits, a risk of future processing, or the abstract market value of her information to establish standing. Her principal injury is that Axia caused third parties to intercept and obtain her private healthcare communications without authorization. Her allegations of emotional distress, loss of control, diminished value, loss of trust, and targeted advertising describe further consequences of that completed disclosure and may bear on damages, but standing does not require each to qualify independently. *See* Compl. ¶¶ 97-106, 142-43. Axia's authorities, which address only profit, speculative future processing, or distress untethered to any disclosure, are therefore beside the point.

Axia's traceability argument, Mot. at 10-11, fails for the same reason. Plaintiff alleges that Axia deliberately installed the trackers, that those trackers intercepted her communications in real time, and that the resulting information was used for commercial advertising. Compl. ¶¶ 29-31, 44, 65, 72, 88-95. These allegations provide a direct causal chain from Axia's conduct to

Plaintiff's privacy injury. Article III requires only that an injury be "fairly traceable" to the challenged conduct—it does not require proof of causation before discovery. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 193-94 (3d Cir. 2016).

Finally, Axia's challenge to prospective relief, Mot. at 11, does not support dismissal. Plaintiff alleges Axia's use of the challenged trackers continues today, Compl. ¶ 29, and that she is an Axia patient who used its Website and Patient Portal for providers, appointments, and billing, *id.* ¶ 86. As *Brunecz* recognized, current patients who depend on their provider's online platforms differ materially from former retail customers who can simply avoid a website. 2026 WL 2043024, at *7 n.8. *Brunecz* denied prospective standing only because the hospital there had removed the trackers before suit. *Id.*, at *7.

In any event, any deficiency as to future Website use would affect only prospective relief, not standing to seek damages for completed interceptions. If the Court concludes Plaintiff must plead expected future use more expressly, she requests leave to amend. *See Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 209 (3d Cir. 2021).

## II. PLAINTIFF PLAUSIBLY ALLEGES AXIA VIOLATED THE ECPA

The ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring another person to intercept an electronic communication. 18 U.S.C. § 2511(1)(a). Plaintiff alleges Axia did exactly that. Axia nevertheless contends the claim fails because Plaintiff purportedly does not allege (1) protected "contents," (2) contemporaneous interception, or (3) a qualifying device, and because Axia claims it could consent to the third-party interception. Mot. at 11-16. None of these attacks warrants dismissal.

### A. Plaintiff Alleges Interception of the Contents of Her Communications

Axia first argues that Plaintiff fails to plead the "contents" of an electronic communication, contending that allegations concerning identifiers, page views, clicks, searches, and form activity do not establish contents unless Plaintiff identifies the precise search term, provider, condition, appointment, payment entry, form submission, or message acquired. Mot. at 12-13. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015) ["*Google Cookie Placement*"], rejects that categorical requirement.

Whether intercepted information constitutes content is a "contextual" and "case-specific" inquiry that turns on the information's role in the communication. *Id.* at 136-37. Information that may sometimes perform a routing or addressing function constitutes "content" when it conveys substantive information to the recipient. *Id.* Accordingly, "there is no general answer" whether even locational information constitutes content—if it is "part of the substantive information conveyed to the recipient, then by definition it is 'content.'" *Id.* at 137.

Applying that rule to internet communications, the Third Circuit explained that search queries reproduced in URLs reveal content because they disclose that the user is searching for information on a particular topic. *Id.* The court did not require identification of every URL or search term intercepted, because the complaint alleged "a broad scheme in which the defendants generally acquired and tracked the plaintiffs' internet usage," which involved acquisition of "at least some 'content' within the meaning of the Wiretap Act." *Id.* at 139.

Plaintiff alleges more than that. The Complaint details how she used Axia's healthcare Website and Patient Portal to search for providers, make medical appointments, and pay medical bills, and how Axia's trackers intercepted and transmitted her messages, reports, and communications to third parties. Compl. ¶¶ 86, 88-91. It alleges that these technologies capture

substantive Website interactions—search queries, providers and healthcare services selected or viewed, links and page elements clicked, and information entered into Website fields—and that appointment information travels together with persistent identifiers and page-level data. *Id.* ¶¶ 33-35, 46-72, 122-23. Section 2510(8) requires information concerning the substance, purport, or meaning of a communication, *see* 18 U.S.C. § 2510(8), it does not require a plaintiff to reproduce the communication verbatim. Axia's demand for the actual search terms, form entries, or network payloads seeks evidence held by Axia and its tracking partners, not facts Rule 8 requires before discovery, *see Google Cookie Placement*, 806 F.3d at 137-39,

*Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58 (W.D. Pa. 2023) ["*Cook I*"], on which Axia principally relies, Mot. at 12-13, does not support a heightened pleading requirement. The allegations there were materially different. The plaintiff alleged only that session-replay software captured activity while she browsed products, entered product searches, and added an item to her cart. *Id.* at 61. She did not enter her name, contact information, address, or billing information, or any other sensitive or personal information, and she did not allege that GameStop identified her in any way. *See Cook II*, 148 F.4th at 156, 159-60. *Cook I* emphasized that she pleaded only the general capabilities of session-replay software, without identifying how GameStop configured it or what it actually captured from her. 689 F. Supp. 3d at 69-70. Plaintiff here alleges that she was an Axia patient who used its healthcare Website and Patient Portal to locate providers, make appointments, and pay medical bills, and that Axia's trackers intercepted those healthcare-related communications that also utilized persistent identifiers. Compl. ¶¶ 33-71, 86, 88-96.

Nor did the Third Circuit endorse *Cook I*'s alternative "contents" analysis. It resolved the appeal solely on Article III standing and stated that, because the plaintiff lacked standing, it was "precluded from addressing the merits" of her WESCA claim. *Cook II*, 148 F.4th at 162 n.5.

*Brunecz*, by contrast, supplies analysis in the healthcare-tracking context. It considered allegations of patient status, portal activity, provider and specialty searches, medical services viewed, and associated identifiers collectively, and held that they plausibly constituted individually identifiable health information ("IIHI"). 2026 WL 2043024, at *4-5, *8. It also rejected the contention that disclosure of a "particular medical diagnosis" is required. *Id.*, at *10. A communication need not disclose a formal diagnosis to convey substantive and intensely private information about the care an identified patient is seeking.

**B. Plaintiff Plausibly Alleges Contemporaneous Interception**

Axia next argues that Plaintiff merely labels the interceptions "real time" and "simultaneous" without pleading the exact sequence in which Axia and each third party received the communications. Mot. at 13. An ECPA "intercept" is the acquisition of contents through a qualifying device, 18 U.S.C. § 2510(4), and must be contemporaneous with transmission rather than a later retrieval from electronic storage. *Fraser v. Nationwide Mutual Insurance Co.*, 352 F.3d 107, 113-14 (3d Cir. 2003). In *Fraser*, the challenged email was accessed from a central file server only after transmission. *Id.* Here the Complaint alleges contemporaneous acquisition at both the technological and Plaintiff-specific levels— Google Analytics trackers "operate in real time to collect and transmit information" as users interact with the Website and "contemporaneously monitor and capture those interactions" as users refine searches and navigate provider profiles, Compl. ¶¶ 33-34; DoubleClick trackers "operate contemporaneously to intercept, collect, and transmit" healthcare-related interactions, *id.* ¶ 48; and the Trade Desk Pixel and the trackers collectively capture and transmit data to third-party servers "in real time," *id.* ¶¶ 51, 75.

Plaintiff alleges that these technologies operated in that manner when she used Axia's Website. Third parties monitored her activity "in real time," her communications were "instantly transmitted," and the interceptions of communications occurred "simultaneously as they were being communicated" and "while the messages, reports, and communications were in transit." *Id.* ¶¶ 88, 91. These allegations describe in detail how these acquisitions occur *during* transmission, not through later access to stored communications, and therefore satisfy *Fraser*.

Axia identifies no allegation that acquisition occurred after transmission was complete. It instead hypothesizes that the technologies may have generated separate analytics events only after Axia received an underlying communication. *See* Mot. at 13. That is a competing account of the trackers' architecture, not a defect in the pleading. The Complaint does not compel Axia's inference, and it cannot be drawn against Plaintiff on a motion to dismiss. The configuration, network requests, and server logs are in Axia's and its vendors' hands. Plausibility is not a probability requirement, and well-pleaded allegations are accepted as true. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016). Axia may ultimately prove a different sequence, but it cannot obtain dismissal by asking the Court to resolve that question now.

### C. Axia's "Device" Argument Ignores Plaintiff's Procurement Theory and the Devices Alleged

Axia argues that Plaintiff identifies only software or computer code, rather than a qualifying "electronic, mechanical, or other device." Mot. at 13-15. This argument begins from the wrong premise. Section 2511(1)(a) imposes liability not only on a person who intercepts a communication, but also on one who "procures any other person to intercept." Plaintiff therefore need not identify a device owned or directly operated by Axia. The statute contemplates liability where the acquisition occurs through another person's apparatus. The ECPA defines a "device"

functionally as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication," subject to exceptions not implicated here. 18 U.S.C. § 2510(5). Nothing in that definition requires standalone interception hardware or ownership by the procuring defendant.

Nor does the Complaint allege disembodied software. Instead, it alleges Axia's tracking code operated through physical computers and servers, including Plaintiff's phone and computer, her browser, and third-party servers. Compl. ¶¶ 29-75, 86. HubSpot's JavaScript is loaded from HubSpot's servers, and its pixels transmit interaction data through track.hubspot.com to those servers. *Id.* ¶¶ 66, 68. The Trade Desk Pixel causes the user's browser to communicate with Trade Desk servers at adsrvr.org. *Id.* ¶ 52. Marketo similarly uses tracking code and servers to assign identifiers and acquire interaction data. *Id.* ¶¶ 60-63. Plaintiff thus identifies both the code causing the acquisition and the computers and servers through which it occurs.

*Brunecz* rejected the same artificial distinction between software and hardware. Addressing materially similar tracking code, the court adopted the reasoning that "software does not operate independently of hardware" and held that either the tracking code itself or "the remote hardware that operates" it may qualify as an intercepting device. 2026 WL 2043024, at *14 (citation modified).

Axia's authorities do not establish that tracking code operating through identified computers and servers falls categorically outside § 2510(5). *Mason v. Machine Zone, Inc.*, 140 F. Supp. 3d 457 (D. Md. 2015), and *Potter v. Havlicek*, 2008 WL 2556723 (S.D. Ohio June 23, 2008), *see* Mot. at 14, asked whether software viewed in isolation is an apparatus, but neither addressed the combined operation of tracking code, a user's browser and computer, and remote servers alleged here. The Florida decisions Axia cites, *see* Mot. at 14-15, apply materially

different state statutes. None addresses § 2511(1)(a)'s procurement language or imposes an ownership requirement.

### D. The One-Party-Consent Defense Does Not Defeat the ECPA Claim

Lastly, Axia invokes the ECPA's one-party-consent provision, arguing that because Plaintiff communicated with Axia, Axia could authorize third parties to intercept those communications. Mot. at 14-16. But that provision expressly does not apply when a communication is intercepted "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). Plaintiff plausibly alleges that crime-tort exception here. Compl. ¶¶ 73-85.

Axia's reliance on *Smart v. Main Line Health*, 2024 WL 2943760 (E.D. Pa. June 10, 2024) ["*Smart I*"], is misplaced. That case concerned the dismissal of an earlier complaint without prejudice, and Axia omits that the plaintiff amended and the court sustained his ECPA claim. *See Smart v. Main Line Health*, 2026 WL 1008171, at *2-4 (E.D. Pa. Apr. 14, 2026) ["*Smart II*"]. Moreover, *Smart II* expressly rejected the same argument Axia presents here—that the alleged HIPAA violation was not sufficiently distinct from the interception itself. The later decision, issued four months before Axia filed its motion, provides the more relevant guidance.

*Smart II* recognized that, under *Google Cookie Placement*, the criminal or tortious purpose must be independent of the interception—a distinct "tortious or criminal use" of the intercepted communications. 2026 WL 1008171, at *2-3 (quoting *Google Cookie Placement*, 806 F.3d at 145). The defendant there argued that its tools intercepted patient communications and transmitted them to Meta "in one fell swoop," leaving no independent criminal act. *Id.*, at *3. The court rejected that characterization, holding "[a]fter the Meta Collection Tools captured the contents of user communications, [defendant] shared that information to allow marketers and advertisers to make targeted outreach to users. Just because those acts happen at nearly the same

time does not mean the act is singular." *Id.* "The use of the intercepted communications is distinct from the capture of those communications." *Id.* It therefore denied dismissal where the plaintiff alleged interception "for the purpose of selling the communications to marketers" in violation of HIPAA. *Id.*, at *4.

The same reasoning applies. HIPAA imposes criminal liability when a covered entity knowingly and unlawfully "discloses [IIHI] to another person." 42 U.S.C. § 1320d-6(a)(3). Here the trackers first acquired Plaintiff's healthcare communications, after which Axia caused the resulting IIHI to be disclosed to third parties for advertising and commercial use. Compl. ¶¶ 28-29, 44, 65, 72, 75, 77-84, 125. As *Smart II* holds, the contemporaneous operation of the technology does not collapse those distinct acts into one.

Axia's characterization of its objective as an "ordinary commercial" purpose, Mot. at 15, does not change the result. HIPAA imposes *enhanced* penalties when an unlawful disclosure is made "with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6(b)(3). Commercial advantage therefore does not negate criminal purpose and may aggravate it.

Nor can Axia rely on *Smart I*'s factual deficiency. Plaintiff alleges she was an Axia patient, used its Website and Patient Portal to search for providers, request and make appointments, and pay medical bills, entered her ZIP code into Axia's provider-search function, and thereafter received advertisements concerning women's health. Compl. ¶¶ 86-89. She alleges the trackers monitored that activity in real time, transmitted her communications to third parties, captured her PHI together with individual identifiers, and enabled commercial use of the information. *Id.* ¶¶ 75, 88-96. Those allegations identify her patient status, her actual healthcare-related Website use, the nature and timing of the transmissions, and the resulting targeted advertising—an interception

undertaken not merely for analytics but for the further purpose of disclosing IIHI to third parties for commercial use, the distinction *Smart II* found sufficient.

Because Plaintiff plausibly alleges Axia procured the interception for the distinct purpose of disclosing IIHI to third parties in violation of HIPAA, the one-party-consent defense provides no basis for dismissal.

Finally, Plaintiff's ECPA count pleads two independent theories—Axia intentionally disclosed the contents of her electronic communications to third parties, 18 U.S.C. § 2511(1)(c), *and* Axia procured third parties to intercept them, *id.* § 2511(1)(a). Compl. ¶¶ 121-24. Because Axia's arguments go to elements common to both theories, the analysis above defeats the motion as to each.

## III. PLAINTIFF PLAUSIBLY ALLEGES A VIOLATION OF WESCA

Axia's WESCA argument, Mot. at 17-20, is irreconcilable with *Brunecz*. Axia largely repeats its ECPA arguments, contending Plaintiff must identify the particular "contents" of a communication intercepted under WESCA. *See id*. But *Brunecz* squarely rejected that premise under the provision Plaintiff invokes.

That is the claim Plaintiff pleads. The WESCA count expressly invokes § 5703(1), Compl. ¶ 129, and alleges Axia intentionally installed and maintained tracking technologies that "procured third parties to intercept and use" her electronic communications, *id.* ¶¶ 130-32. Axia cites *Brunecz* elsewhere but never acknowledges its construction of § 5703(1) or explains why this Court should impose a contents requirement that recent decisions applying Pennsylvania law have rejected.

Even if § 5703(1) required Plaintiff to identify contents, the Complaint satisfies that requirement. *Brunecz* independently held that acquisition of "at least some content" could

reasonably be inferred from allegations plausibly demonstrating "a broad scheme in which the defendant[] generally acquired and tracked the plaintiffs' internet usage." 2026 WL 2043024, at *13 (quoting *Google Cookie Placement*, 806 F.3d at 139). It did not require the plaintiffs to reproduce the information transmitted before discovery.

Here the Complaint describes how the technologies capture search terms, page views, provider and service selections, information entered into forms, appointment activity, communications, and healthcare-payment interactions. Compl. ¶¶ 33-75. It further alleges that Plaintiff used the Website and Patient Portal to search for providers, request and make appointments, and pay medical bills; that she entered her ZIP code into the provider-search function; that her communications were monitored and transmitted to third parties in real time; and that she thereafter received targeted women's-health advertising. *Id.* ¶¶ 86-96. Those allegations permit the inference that the trackers acquired the substance of at least some communications, not merely noncommunicative mouse movements or abstract identifiers.

Axia attempts to defeat that inference by isolating each allegation. It characterizes Plaintiff's ZIP code as nonmedical, her patient status as insufficiently identifying, her healthcare activities as insufficiently specific, and the alleged tracker functionality as hypothetical. Mot. at 17-19. But the Complaint must be read collectively. At this stage, the Court must credit those allegations rather than assume the trackers captured only innocuous metadata.

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734 (E.D. Pa. Oct. 10, 2023), which Axia relies on, Mot. at 18, does not counsel otherwise. *Murphy* dismissed without prejudice a complaint that recited categories of information—symptoms, conditions, appointments, test results, medications, treatments, insurance, and bills—without connecting the trackers to the pages the plaintiffs actually used or to any identifier capable of linking the activity

to them. 2023 WL 7017734, at *3. The Complaint does both. It identifies each tracker Axia deployed, the particular cookies and identifiers each sets, the servers to which each transmits, and the mechanism by which HubSpot and Marketo bridge anonymous browsing to an identified contact record. Compl. ¶¶ 33-72. *Murphy* also preceded *Brunecz*, and did not address § 5703(1)'s omission of any contents element.

*Cook* does not alter the result, *see* Mot. at 17, for the reasons given above. *Cook I* involved ordinary retail browsing by a plaintiff who supplied nothing that "could connect her browsing activity to her," 689 F. Supp. 3d at 65-66 & n.2, and the Third Circuit expressly declined to reach the merits of her WESCA claim, *Cook II*, 148 F.4th at 162 n.5.

Axia's contemporaneity argument fares no better. Mot. at 18-19. WESCA, like the ECPA, requires acquisition contemporaneous with transmission rather than later access to a stored communication. *Commonwealth v. Cole*, 167 A.3d 49, 62 (Pa. Super. Ct. 2017). The allegations set out above satisfy that requirement, Compl. ¶¶ 33-35, 44, 48, 51, 75, 88, 91. Axia's contrary hypothesis about when analytics events were generated raises a factual dispute about system architecture that cannot be resolved on the pleadings.

Finally, the trackers qualify as intercepting devices at this stage. *Brunecz* held that tracking code operating through computer hardware or remote servers may plausibly constitute a "device" under WESCA. 2026 WL 2043024, at *14. Plaintiff alleges Axia installed executable third-party code that operated through users' phones and computers and transmitted their communications to third-party servers. Compl. ¶¶ 29-75, 86, 88.

In sum, Plaintiff plausibly alleges Axia intentionally procured third parties to intercept her electronic communications in violation of § 5703(1). *Brunecz* and a plain reading of the statute

are fatal to Axia's threshold "contents" argument. Plaintiff's allegations of real-time, simultaneous acquisition likewise satisfy contemporaneity. The WESCA claim should proceed.

Plaintiff likewise does not abandon her claims under §§ 5703(2) and (3) and § 5725(a)(2)-(3), which reach the disclosure and use of intercepted contents. Compl. ¶¶ 129-32. Because the Complaint adequately identifies contents for the reasons stated above, those theories survive as well.

## IV. PLAINTIFF PLAUSIBLY ALLEGES NEGLIGENCE

To plead negligence under Pennsylvania law, a plaintiff must allege duty, breach, causation, and actual loss or damage. *Zimmerman v. Highmark, Inc.*, 780 F. Supp. 3d 588, 602 (W.D. Pa. 2025) (citation omitted). Plaintiff alleges each element here.

### A. Axia Owed Plaintiff a Duty to Protect Her Private Health Information

Plaintiff alleges Axia owed her a duty arising from the healthcare provider-patient relationship and the foreseeable risk created by Axia's affirmative collection and handling of sensitive health information. Compl. ¶¶ 137-39. That theory accords with *Zimmerman*, which recognizes a duty of reasonable care where a defendant affirmatively collects healthcare data and its conduct creates a foreseeable risk of disclosure. 780 F. Supp. 3d at 603 ("[p]laintiffs have sufficiently alleged that [defendant] had a common-law duty to protect their [healthcare] information").

*Brunecz* supports the same conclusion. The hospital there argued that IP addresses, cookies, and website-viewing information were insufficient to give rise to a duty. The court disagreed, distinguishing *Santoro v. Tower Health*, 2024 WL 1773371 (E.D. Pa. Apr. 24, 2024)—on which Axia also relies, Mot. at 20—because the *Brunecz* plaintiffs alleged considerably more, including patient status, portal activity, provider and specialty searches, medical services viewed,

and associated identifiers. 2026 WL 2043024, at *8. Those allegations sufficiently pleaded a duty of reasonable care. *Id.*

Plaintiff alleges the same relationship and collection. She was an Axia patient who used its Website and Patient Portal to locate providers, make appointments, and pay medical bills, Compl. ¶ 86, and third parties intercepted her communications during those interactions, *id.* ¶¶ 88-93. Axia focuses on paragraph 87 and argues that the only "specific" information identified is a ZIP code. Mot. at 19-20. But paragraph 87 does not allege that Plaintiff entered *only* a ZIP code. Paragraph 86 identifies additional healthcare transactions, and paragraph 88 alleges those communications were intercepted. One expressly identified input cannot be read as an admission that no other healthcare communication occurred.

Nor can Axia avoid *Dittman* by distinguishing information it "affirmatively collected" from information collected through the third-party technologies it selected and installed. *See* Mot. at 20 (citing *Dittman v. UPMC*, 196 A.3d 1036, 1047-48 (Pa. 2018)). Axia affirmatively introduced those technologies into its Website and thereby caused Plaintiff's information to be captured and transmitted. *Dittman* held that an employer's decision to collect and store employees' personal information on an internet-accessible system without adequate security "plainly constitute[d] affirmative conduct" giving rise to a duty to protect against the foreseeable risk that a third party would exploit the resulting vulnerability. 196 A.3d at 1047. It rejected the argument that intervening third-party conduct eliminates that duty, because UPMC's own conduct "created the risk," UPMC. *Id.* at 1048-49.

### B. Plaintiff Alleges Breach

Axia argues Plaintiff fails to identify a "specific security or handling deficiency." Mot. at 20-21. That characterization ignores the breach actually alleged. Axia embedded third-party

advertising and analytics trackers on a healthcare Website and allowed them to transmit private patient communications to commercial third parties, despite controlling where those trackers operated and having the ability to exclude them from sensitive pages. Compl. ¶¶ 124, 140-41. Plaintiff does not allege merely that Axia failed to prevent disclosure. She alleges Axia created the disclosure mechanism.

*In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514 (M.D. Pa. 2021), is therefore inapposite. That case concerned a third-party cyberattack, making the adequacy of the defendant's security precautions central to breach. *See id.* Unlike failing to prevent malicious hackers from stealing data, here Plaintiff alleges Axia itself deliberately installed and maintained the mechanism that disclosed patient communications.

**C. Plaintiff Alleges Causation and Damages**

Axia's remaining attack fares no better. It argues causation is absent because Plaintiff's advertisements merely concerned "women's health," unlike the Cologuard advertisements in *Brunecz*. Mot. at 20. But that elevates one fact that strengthened causation in *Brunecz* into a mandatory element. Plaintiff alleges Axia installed the trackers, that they intercepted and transmitted her healthcare communications in real time, and that the resulting disclosure invaded her privacy and caused emotional and economic harm. Compl. ¶¶ 29-75, 88-97, 140-43. That is an adequate causal chain— the women's-health advertising corroborates it.

As to damages, Plaintiff's principal injury occurred when Axia caused her private healthcare communications to be transmitted without consent, causing invasion of privacy, loss of control and economic value, emotional distress, anxiety, and loss of trust. Compl. ¶¶ 88-106, 140-43. She need not establish the ultimate measure of each category at the pleading stage. *Brunecz* confirms as much: although the defendant there called the emotional injuries boilerplate,

the plaintiffs also alleged lost value of their private information and mitigation costs, and the court—relying on authority recognizing the property value of personal information—held those allegations sufficient to support negligence. 2026 WL 2043024, at *9.

## V. PLAINTIFF PLAUSIBLY ALLEGES UNJUST ENRICHMENT

To state an unjust-enrichment claim under Pennsylvania law, Plaintiff must allege that she conferred a benefit on Axia, that Axia appreciated the benefit, and that Axia retained it under circumstances making retention inequitable. *Tignor v. Dollar Energy Fund, Inc.*, 745 F. Supp. 3d 189, 205 (W.D. Pa. 2024). Like her negligence claim, Plaintiff sufficiently pleads each element.

Plaintiff alleges she conferred "direct and measurable economic benefits" on Axia through PII and PHI that Axia intercepted, collected, and monetized, including profits and revenue from optimizing its marketing and enabling targeted advertising. Compl. ¶ 145. Axia appreciated those benefits and deployed the technologies precisely because the captured data had commercial value, *id.* ¶ 146, the benefits were traceable to its interception and use of her information, *id.* ¶ 147, and Axia retained them without authorization or compensation, *id.* ¶¶ 148-49.

Plaintiff also alleges the economic pathway. Google Analytics enabled Axia to measure advertising effectiveness and improve targeted marketing, *id.* ¶¶ 43-44, and Marketo and HubSpot associated healthcare browsing with identified records so Axia could improve and broaden its marketing, *id.* ¶¶ 64-65, 71-72. Those are the same marketing and advertising-cost benefits that supported the unjust enrichment claim in *Adair*. *See* Mot. at 23. The revenue earned, advertising cost saved, or accounting value assigned to Plaintiff's data lies uniquely within Axia's possession and is a subject for discovery, not a pleading requirement.

*Brunecz* rejected a materially similar argument. The plaintiffs alleged they conferred PHI on the hospital, which disclosed it without authorization and retained a monetary benefit at their

expense. The court held those allegations sufficient, relying on decisions recognizing that sensitive medical information has value and that its provision for targeted advertising may confer a cognizable benefit. 2026 WL 2043024, at *11-12.

Plaintiff need not allege that she separately purchased "tracking-free" Website access. *See* Mot. at 23. Her theory is not that Axia failed to supply a contractual privacy service she paid for. Her theory is that Axia obtained and commercially exploited a valuable resource—her private healthcare information—without authorization or compensation, acquiring the marketing value of information she otherwise controlled while she sustained a corresponding loss of privacy and control.

Nor does the claim rest on nondisclosure alone. The Complaint alleges that Axia deliberately procured private patient information for commercial marketing, knew that information had substantial value, and retained the resulting benefits without Plaintiff's knowledge, authorization, or compensation. Compl. ¶¶ 145-49. Axia distinguishes *Brunecz* on the ground that those plaintiffs pleaded more detailed medical activity and treatment-specific advertising, Mot. at 22-23, but those facts supported the inference that private information was disclosed—they did not create a new element requiring pre-discovery access to a defendant's internal accounting. Rule 8 requires a plausible claim, not an accounting of Axia's books.

## **CONCLUSION**

The Court should deny Axia's motion to dismiss. If the Court concludes any claim is deficient, however, Plaintiff respectfully requests leave to amend.

Dated: September 1, 2026

/s/ Trevor Flynn

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (*Pro Hac Vice*)
*jfitzgerald@fmfpc.com*

TREVOR FLYNN (*Pro Hac Vice*)
*tflynn@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**LAW OFFICES OF MICHAEL J. KENNY**
MICHAEL J. KENNY (Bar No. 81623)
1511 Wyoming Ave.
Scranton, PA 18509
Phone: (570) 241-1667

***Counsel for Plaintiff***